UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHN H. DETAR, et al.,

    Defendants.
                                      /

File No. 1:04-CV-749

HON. ROBERT HOLMES BELL

## **O P I N I O N**

### **I. Procedural History**

The government brought this action against Defendants Dr. John H. DeTar, Ann W. Detar, Edward G. DeTar ("Trustee"), as trustee for the John H. DeTar Children's Trust ("Trust"),[1] and Sharon L. Hyre to foreclose on tax liens arising under 26 U.S.C. § 6321 and a judgment lien arising under 28 U.S.C. § 3201. The government contends that these liens attach to real estate located on Torch Lake in Bellaire, Michigan (the "Property"). Defendants are individuals that may have an interest in the Property. Defendants Dr. John H. DeTar ("Dr. DeTar") and Ann W. DeTar (collectively, "Taxpayers") are the taxpayers liable for satisfaction of the liens. The Trust is the current owner of the Property. Defendant

---

[1] The complaint alleges that Josephine DeTar is the trustee of the Trust. By stipulation, the parties substituted Edward G. Detar, the current trustee of the Trust, in place of Josephine. (Dkt. No. 16.)

Sharon Hyre is a resident of the Property. This matter is before the Court on cross-motions for summary judgment filed by the government and by Defendant Trustee. (Dkt. Nos. 29, 37.) Defendant Dr. DeTar has also filed a motion to expunge the government's motion for summary judgment. (Dkt. No. 42.) The Court heard oral argument on the pending motions on March 20, 2009. At oral argument, the Court received evidence of release of certain liens on the Property. Subsequently, the parties submitted written arguments to brief the Court with respect to the effect, if any, of these releases on this action. (Dkt. Nos. 54-58.)

## II. Jurisdiction and Summary Judgment

The Court has jurisdiction in this matter pursuant to 26 U.S.C. § 7402(a) and 28 U.S.C. §§ 1340 and 1345.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). However, the Court must view the facts in the light most favorable to the nonmoving party only when there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1775 (2007). The mere

existence of a scintilla of evidence is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989). Where cross-motions for summary judgment have been filed, the Court must evaluate each motion on its own merits, and view all facts and inferences in the light most favorable to the nonmoving party. *Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 917 (6th Cir. 2004).

Where the movant has the burden of proof, the "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Thus, "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III. Background

**A. Taxpayers**

Taxpayers have a long history of failure to pay federal income taxes when due, from as early as 1960 until as recently as 1995. In February 1968, the government filed a notice of federal tax liens against Taxpayers for unpaid taxes in 1960 through 1966. (Dkt. No. 38,

3

Plf.'s Br. in Supp. of Mot. for Summ. J., Ex. A.)[2]  In 1975, the government obtained a judgment against Taxpayers in the United States District Court for the District of Nevada for tax liabilities in the years 1967 to 1972.  In 1986, Dr. DeTar was convicted willful tax evasion in the District of Nevada; this conviction was later reduced to willful failure to pay taxes for tax years 1977 through 1984.  In 1990, the government obtained a judgment against Taxpayers of $63,033.84 for their unpaid taxes for the years 1982, 1983, 1984, 1987, and 1988.  *United States v. DeTar*, No. CV-B-89-604-PMP (D. Nev. July 31, 1990) (*See* Dkt. No. 54, Ex. 1, Abstract of Judgment.)  In 1992, the court for the District of Nevada upheld the levy and sale of Taxpayers' residence in Reno, Nevada, to satisfy unpaid tax liabilities. *See DeTar v. United States*, No. CV-N-86-465-LDG, 1992 WL 173382 (D. Nev. Feb. 5 1992), *amended by* 1994 WL 421444 (D. Nev. Jan. 14, 1994).  In 1999, the government assessed Taxpayers for additional unpaid taxes for the years 1993, 1994, and 1995.  (Pl. Ex. A at 3, Notice of Federal Tax Lien.)

**B. The Trust**

In 1967, Dr. DeTar approached a family friend, Dr. William Schaefer, to establish a trust for the purpose of providing for the education of Dr. DeTar's children.  (Trial Tr. 167-68.)  When the Trust was established, Dr. Schaefer became the trustee.  (Pl. Ex. C, Decl. of

---

[2]In this opinion, the Court will refer to exhibits to the government's motion as "Pl. Ex. at [page]" and exhibits to Defendant Trustee's motion as "Def. Ex. at [page]".  The government's Exhibits D and E to their motion for summary judgment consist of a transcript from Dr. DeTar's 1986 criminal trial in the United States District Court for the District of Nevada.  The Court will cite this transcript as "Trial Tr. [page]."

Trust.) According to Dr. Schaefer, Dr. DeTar indicated that he had not paid his federal income taxes for some time and he wanted the Trust to own Taxpayer's property in Reno, Nevada, in order to avoid tax liens that the government might place on it. (Trial Tr. 168-69.) Thus, Taxpayers placed their home in Reno into the Trust. (*Id.*)

Around 1976, Dr. DeTar's son, John W. DeTar, became trustee, serving in that capacity until 1980. (Trial Tr. 219-20, 274, 296.) Dr. DeTar's daughter-in-law, Carolyn DeTar, served as trustee from 1981 to 1984. (Trial Tr. 340, 372.) In 1984, Carolyn was replaced by Dr. DeTar's daughter, Josephine E. DeTar (Trial Tr. 372), who served as trustee until 2002 (Def. Ex. D). Dr. DeTar's son, Edward G. DeTar, replaced Josephine and has served as trustee since that time. (*Id.*)

**C. Ownership of the Property**

Taxpayers acquired the Property, a vacation home on Torch Lake, in 1962. (Def. Ex. 3.) In 1968, one month after the government filed a notice of federal tax liens, Taxpayers conveyed the Property to the Stewart Asset Company, an entity owned by Dr. DeTar's parents. (*Id.* at Ex. F.) The Stewart Asset Company conveyed the Property to the Trust in 1969. (Def. Ex. 2.) In 1977, the Trust conveyed the Property to the Church of the New Israelites of Jacob (the "Church"), of which Dr. DeTar was the pastor and administrator. (Pl. Ex. F, G.) The Church held ownership of the Property until 1985, when it transferred it back to the Trust. (Pl. Ex. I.) The Trust has been the record owner of the Property since 1985.

## IV. Analysis

**A. Liens**

The government initially asserted that the basis for its foreclosure action were liens arising from tax assessments on unpaid taxes for the years 1982 through 1984, 1987, 1988, and 1993 through 1995. Under 26 U.S.C. § 6321, the amount of a person's tax liability becomes, after demand for payment, a lien in favor of the United States on "all property and rights to property" of that person. *Id.* The government also asserted a judgment lien based on the 1990 judgment. Under 28 U.S.C. § 3201, "A judgment in a civil action shall create a lien on all real property of a judgment debtor on filing a certified copy of the abstract of the judgment . . . ." *Id.*

At oral argument Defendant Trustee presented evidence of the filing of certificates of release of federal tax liens, recorded in May 2008. The documents presented to the Court are Form 668 (Z) Certificate of Release of Federal Tax Lien. The releases identify the Property, reference tax liabilities for the tax years 1982, 1983, 1984, 1987, and 1988, and indicate that Taxpayers "have satisfied the taxes listed below . . . [t]herefore the lien provided by [§ 6321] for these taxes and additions has been released." Trustee argued that these certificates extinguished the tax liens arising on the Property as a result of the tax liabilities for the years 1982 through 1988. *See* 26 U.S.C. § 6325(f)(1)(A) (providing that a certificate of release is "conclusive" that the lien referred to is extinguished). The government contends that the releases were mistakenly filed by the IRS, but concedes that the certificates

6

extinguish the liens referenced therein. Nevertheless, the government asserts that it continues to rely upon the judgment lien, as well as the tax lien for liabilities incurred in 1993 through 1995, to support its foreclosure action.

Assuming that the tax liens for 1982 through 1988 have been extinguished, the government is correct that the certificates of release have no effect on the underlying tax liability. Section 6325 provides that releases are conclusive with respect to release of the liens, but it does not indicate that the releases are conclusive with respect to satisfaction of the underlying tax liabilities. *See Boyer v. Comm'r of Internal Revenue*, 86 T.C.M. (CCH) 615, 2003 WL 22725293, at *3 (2003) (noting that "[i]t is well settled that although a certificate of tax lien release is conclusive that the lien is extinguished, it is not conclusive that the tax liability is extinguished" and citing cases); *see also* 25 C.F.R. § 301.6325-1(a)(1) (West. 2009) (providing for the filing of a certificate of release and noting that "[i]n all cases, the liability for the payment of the tax continues until satisfaction of the tax in full or until the expiration of the statutory period for collection . . . ."). Moreover, if the releases extinguished the underlying liability, then there would be no need for § 6325 to provide a procedure for revocation of the releases and reinstatement of the liens in the event that releases are mistakenly filed. *See* 26 U.S.C. § 6325(f)(2). Thus, while the tax liens for tax liabilities for 1982 through 1988 have been extinguished, there is no evidence that the tax liabilities upon which these liens, and upon which the judgment, are based have been satisfied. Defendants do not contend that any of the foregoing have been satisfied, nor do

they dispute the existence or amount of the underlying tax liabilities. Defendants also do not dispute the validity or existence of the judgment lien, or the tax liens arising from unpaid taxes for the years 1993 through 1995.

To the extent that the government relies upon the judgment lien rather than the individual tax liens, Defendant Trust contends that the government is attempting to improperly "bootstrap" the judgment lien arising under 28 U.S.C. § 3201 onto a foreclosure action for tax liens arising under 26 U.S.C. § 6321. Defendant contends that the government has not complied with the proper procedures for foreclosure under § 3201, though Defendant does not indicate what such procedures might be or how they would differ from foreclosure of a § 6321 tax lien.

According to the plain language of the applicable statutes, a judgment lien under § 3201 is distinguishable from a tax lien under § 6321. A tax lien attaches to "all property and rights to property" belonging to the taxpayers. 26 U.S.C. § 6321. In contrast, a judgment lien attaches more narrowly to all "real property of a judgment debtor." 28 U.S.C. § 3201. There is no dispute that the Property is currently owned by the Trust, rather than the Taxpayers; however, the government contends that it can foreclose on the Property under both types of liens because the Property is held by the nominee or alter ego of Taxpayers.

While a federal tax lien does not attach to property not owned by the taxpayer under state law, it is well-established that a taxpayer's "rights to property" under § 6321 can include assets held by the taxpayer's nominee or alter ego. *G.M. Leasing Corp. v. United States*, 429

U.S. 338, 350-51 (1977); *Lemaster v. United States*, 891 F.2d 115, 119 (6th Cir. 1989). The language of § 6321 is "broad" and reflects Congress' intent to "'reach every interest in property that a taxpayer might have.'" *Drye v. United States*, 528 U.S. 49, 56 (1999) (quoting *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 719-720, 105 S. Ct. 2919 (1985)). However, the government offers no authority, and the Court is not aware of any authority, for the proposition that a *judgment lien* attaches to the real property of a nominee or alter ego of a judgment debtor.[3] Thus, to the extent that the government's motion for summary judgment relies upon the judgment lien, it will be denied.

To determine whether a § 6321 tax lien attaches to particular property, the Court must "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Drye*, 528 U.S. at 59; *Spotts v. United States*, 429 F.3d 248, 252-53 (6th Cir. 2005). The interest of the taxpayer in the subject property is determined as of the date that the lien arose, *i.e.* when the taxes were assessed. *Spotts*, 429 F.3d at 253; 26 U.S.C. § 6322. In this case, the government seeks to foreclose on unpaid tax liabilities assessed in 1999, for taxes liabilities arising between 1993 and 1995. (Pl. Ex. A at 3.)

---

[3] While there may be other means for a judgment creditor to reach assets held by a third party, such as through a fraudulent conveyance action, the government has not asserted a basis for doing so.

**B. Trust as Nominee**

The government argues that the Trust holds the Property as the nominee or alter ego of Taxpayers. Nominee theory focuses on the relationship between the taxpayer and the property to determine true beneficial ownership of the property. *Spotts,* 429 F.3d at 253; *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000). "A 'nominee' is a person or entity who holds legal title to property that in truth belongs to another who exercises control over and realizes the benefit of it." *Sumpter v. United States*, 302 F. Supp. 2d 707, 720 (E.D. Mich. 2004). Generally, nominee status is determined by the degree of control that a party exerts over the nominee and the subject property. *Id.* The government and the Trust cite the following factors to determine whether property is held by a nominee:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Porta-John of Am., Inc. v. United States*, 4 F. Supp. 2d 688, 701 (E.D. Mich. 1998); *see also Sumpter*, 302 F. Supp. 2d at 721 (citing *Porta-John*).

The Court acknowledges that, in *Porta-John*, the court cited only federal case law as the basis for its six factors, yet under *Drye* and *Spotts*, the Court must look initially to the law of the forum state to determine Taxpayers' rights in the Property. However, the Court is not

aware of any Michigan case law discussing nominee theory, and the parties have cited none.[4]

In the absence of clear state law on the issue, a court may look to other courts for guidance. *Spotts*, 429 F.3d at 253; *PBV, Inc. v. Rossotti*, No. 98-3504, 1999 WL 220123, at *2 (6th Cir. Apr. 6, 1999). For the foregoing reasons, the Court will follow the *Porta-John* factors cited by the parties.

In his motion for summary judgment, Trustee contends that Taxpayers transferred their ownership in the property to a third party prior to the tax liabilities at issue, and thus the government's rights are subject to the rights of the current owner, the Trust. Taxpayers cite the Nevada case that adjudicated the levy of Taxpayers' residence in Reno, Nevada:

> Claims competing with the federal tax liens must compete on a "first in time, first in right" basis and will prevail only if they become choate before the taxes are assessed. *United States v. Equitable Assurance Soc.*, 384 U.S. 323, 86 S. Ct. 1561 (1966). The second deed of trust on the property, held by the Trust, existed before the taxes in this suit were assessed. Therefore, any claim the United States may be found to have acquired with respect to the property will be subject to the $25,000 note and the second deed of trust.

---

[4]Though Michigan courts do not discuss nominee theory by that name, the Court notes that the *Porta-John* factors are virtually identical to "badges of fraud" that are often used by Michigan courts to determine whether property has been fraudulently conveyed to a third party:

> lack of consideration for the conveyance; a close relationship between transferor and transferee; pendency or threat of litigation; financial difficulties of the transferor; and retention of the possession, control, or benefit of the property by the transferor.

*Coleman-Nichols v. Tixon Corp.*, 513 N.W.2d 441, 449 (Mich. Ct. App. 1994). Courts in other jurisdictions have used state law "badges of fraud" as guidance for nominee theory. *See, e.g., Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001); *In re Krause*, 386 B.R. 785, 834 (D. Kan. 2008).

*DeTar v. United States*, 1992 WL 173382, at *2. However, at issue is whether the tax lien can attach to the Property, even though it is owned by the Trust. If the Trust was the alter ego or nominee of Taxpayers when the taxes were assessed, then the Property was, for purposes of § 6321, "property" or "rights to property" of Taxpayers, notwithstanding any rights of the Trust. The Nevada district court did not consider whether the Trust was a nominee or alter ego of Taxpayers. Thus, the fact that the Property was conveyed to the Trust before the liens arose in this case does not alter the Court's analysis.

(1) Whether inadequate consideration was paid by the nominee.

The parties dispute whether Taxpayers received adequate consideration when they first transferred the Property to a third party, the Stewart Asset Company, in 1968. The government indicates that Dr. DeTar admitted in response to a request for admission that he did not "receive any money or other consideration" for transfer of the Property to Stewart Asset Company. (Pl. Ex. F ¶ 3.) However, the admission referenced by the government is ambiguous. The admission by Dr. DeTar states that "no money was transferred upon transfer of the title to the Children's Trust." (*Id.*) Not only does the admission appear to refer to a different transfer (*i.e.* to the Trust rather than to Stewart Asset Company), but it refers solely to transfer of money as consideration. Trustee also indicates that the deed recited that Stewart Asset Company would assume liability for outstanding mortgages on the Property, totalling over thirty thousand dollars. (Def. Ex. 2.) If the home was worth substantially more than this amount, this may have constituted inadequate consideration; however, the Court has

been offered no evidence of the value of the home with which to make this determination. Thus, there remains an issue of fact with respect to whether adequate consideration was paid for the Property by Stewart Asset Company.[5]

(2) Whether the Property was placed in the nominee's name in anticipation of liability

At Dr. DeTar's criminal trial, Dr. Schaefer, the trustee for the Trust from 1967 to 1976, testified that Taxpayers transferred Taxpayer's home in Reno, Nevada, to the Trust in order to avoid the attachment of tax liens. (Trial Tr. 168.) According to a letter sent to Dr. Schaefer in 1967, Dr. DeTar expressed that "I expect to have continuing troubles as long as I have any property, but I believe the troubles should cease for others when the [Reno] property is completely out of my hands. Incidentally, my parents want to give the trust the Torch Lake property . . . ." (Trial Tr. 182.) Problematically, this evidence relates primarily to the residence in Reno, not the Property located on Torch Lake; moreover, it appears that by the time the letter was written, the Property was owned by Dr. DeTar's parents rather than Taxpayers.

There is no genuine dispute, however, that Taxpayers had incurred tax liabilities prior to transfer of the Property. By the time of the transfer, Taxpayers had been assessed almost

---

[5]The parties have focused on whether Taxpayers received consideration, but there is also evidence that the Trust, the current owner of the Property, has not paid any consideration for its interest in the Property. There is no dispute that it did not pay any consideration when it acquired the Property from Stewart Asset Company in 1969 (Pl. Ex. F, Def. Resp. to Req. for Admission ¶ 6.), and when it reacquired the Property from the Church in 1986, the deed transferring the Property recites consideration of "one dollar ($1.00) and no other valuable consideration[.]" (Pl. Ex. I.)

13

$20,000 in tax liabilities; moreover, the transfer was made only one month after the government filed a tax lien against Taxpayers in the county where the Property is located. (Pl. Ex. A.) Trustee does not dispute the existence or timing of these tax liabilities, but argues that the transfer was not made in anticipation of liability because the tax liabilities *at issue in this case* did not arise until many years later. Trustee's argument is not persuasive. In examining the initial transfer of the Property, the Court is concerned with Taxpayers' relationship to the nominee and the Property, not Taxpayers' relationship and liability to the government. If Taxpayers transferred property to a third party as a means to avoid anticipated liability, the nature of the liability is irrelevant. If the Court were to follow Defendant's logic, a delinquent taxpayer could transfer assets to a third-party nominee and shield those assets from all future tax liabilities incurred after the date of transfer, notwithstanding the taxpayer's continuing beneficial ownership and control over those assets. The Court declines to take such a narrow approach to nominee status.

(3) Whether Taxpayers remain in control of the Property.

The government's evidence also indicates that Dr. DeTar has exerted substantial control over ownership of the Property since it was acquired by the Trust. The Trust transferred the Property to the Church in 1977 under a land contract purportedly worth $120,000. (Pl. Ex. G.) Dr. DeTar initiated the idea for this transfer, and instructed the Trust on how to effect it. (Trial Tr. 231-32.) He also drafted the land contract and executed it on behalf of both the Church and the Trust. (Pl. Ex. G.) Later, Dr. DeTar personally provided

all of the funds to the Trust on behalf of the Church under the land contract. (Pl. Ex. F, Def.'s Resp. to Req. for Admission ¶ 13.) When the Church transferred its interest in the Property back to the Trust in 1985, Dr. DeTar executed the deed on behalf the Church. (Pl. Ex. I.)

(4) Whether there is a close relationship between the nominee and the Taxpayers.

The Trust was established for the benefit of Taxpayers' children. At all times that the Trust has held the Property, the trustee has been a close friend or family member of Taxpayers. *See Brydges v. Emmendorfer*, 18 N.W.2d 822, 824 (Mich. 1945) ("As a general rule transactions between members of a family must be closely scrutinized when the rights of creditors are involved and when such transactions are accompanied by other badges of fraud . . . .") (quoting *Farrell v. Paulus*, 309 Mich. 441, 450, 15 N.W.2d 700, 704 (1944)).

Moreover, Dr. DeTar has been closely associated with the financial resources of the Trust and their management. Dr. DeTar has been a substantial source, if not the only source, of income for the Trust;[6] he has funded the Trust when requested by the trustee,[7] and instructed the Trust regarding which bills and expenses to pay[8] and how to allocate his payments to the Trust.[9]

---

[6] Pl. Ex. J at 4, 7-9, 11-14, 19-21, 37, 41-43, 74-77 (detailing payments to the Trust). In a letter dated October 13, 1994, Dr. DeTar notes that he paid over $1000 in maintenance expenses for the Property because "the trust simply did not have the money." (Pl. Ex. J at 22.) In 1992, the Nevada district court determined that the "'rental payments' and other gifts from [Taxpayers] have been the only source of income for the Trust during the twenty years of its existence." *Detar*, 1992 WL 173382, at *1.

[7] Trial Tr. 356-57.

[8] Pl. Ex. J at 1, 3, 26, 56.

[9] Pl. Ex. J at 4, 7, 8, 9, 13, 15, 19.

15

(5) Whether the conveyances were recorded.

All of the relevant deeds appear to have been recorded, though the deed conveying the Property from the Church to the Trust was executed in October 1985, and was not recorded until May 1986. (Pl. Ex. I.)

(6) Whether the transferor retained possession and/or continued to enjoy the benefits of the Property.

Copies of letters and bank checks offered by the government indicate that Dr. DeTar used the Property's address as a return mailing address, and the letters themselves refer to Taxpayers' use of the Property.[10] Trustee asserts in his brief that Taxpayers have not continued to possess or enjoy the benefits of the Property; however, Trustee offers no evidence to support this assertion. Trustee's cursory denials in its brief are insufficient to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e) (providing that a "an opposing party may not rely merely on allegations or denials in its own pleading"; a response must be supported by affidavits and other evidence setting out "specific facts showing a genuine issue for trial").

Various letters and maintenance receipts also indicate that Dr. DeTar oversaw

---

[10]Pl. Ex. J at 1, 16, 22 33, 44, 47-48, 63-70, 78. In one letter, Dr. DeTar writes, "Mom and I have had a simply great summer at the lake . . . ." (Pl. Ex. J at 22, 10/13/1994 letter.) Pl. Ex. J. at 22, 47-48, 63-65. Another letter from Dr. DeTar to his daughter states "[The Property] has been accessible for use of those of your siblings who wish to use, at not a dollar expense to anyone . . . I suspect . . . that Mom and I will continue to come [to the Property] because I earn a good income and enjoy the perks of golf rangership." (Pl. Ex. J at 48.) Another letter, dated September 18, 1996, states "Next week should be exciting as we bring in the boats and the dock. I could have had three giveaway E boats . . . . They can wait until next year." (Pl. Ex. J at 78.)

16

maintenance of the Property and paid for maintenance expenses.[11]

The only evidence submitted by Defendants purporting to support the Trust's management of the Property consists of affidavits from the current and former trustees for the Trust, Josephine and Edward, asserting that the Trust has paid the local property taxes for the Property for the years 1990 through 2000 and has filed federal income tax returns for the Trust. (Def. Ex. D.) Given that Dr. DeTar appears to have been the source of all or substantially all of the Trust's income, the significance of this evidence is unclear.[12] The only other evidence of the Trust bearing responsibility for expenses related to the Property are receipts and bills submitted by Dr. DeTar to the Trust, which he either directs should be paid by the Trust, or as is more often the case, "credited" to him as payments to the Trust. (*See* note 8, *supra*.) Apart from the foregoing, Defendants have offered no evidence of the Trust's payment of expenses for the Property, or of its involvement in the oversight, management, or control of the Property.[13]

---

[11]Pl. Ex. J. at 1, 2, 15, 22, 45, 50, 52, 55, 63, 66, 80, 83-86. A July 14, 1992, letter from Dr. DeTar to Josephine, then trustee for the Trust, states that Taxpayers have "paid in full" the "overhead" on the Property "except for a pittance which you have paid." (Pl. Ex. J at 45.) In a letter dated October 13, 1994, Dr. DeTar notes that he paid over $1000 in maintenance expenses because "the trust simply did not have the money." (Pl. Ex. J at 22.)

[12] There is also evidence that Dr. DeTar funded the Trust's payment of the property taxes. In a letter dated October 13, 1994, Dr. DeTar writes to Josephine that "there are still unpaid taxes on the place. I will do my best to help by paying more interest . . . ." (Pl. Ex. J at 23.) In another letter, dated November 15, 1994, Dr. DeTar writes to Josephine that he is sending her $2000 so that she can "pay yourself back any taxes you paid on the [Property]." (Pl. Ex. J at 13.)

[13] Dr. DeTar asserts in responses to requests for admission that the Trust "made payments" and "made decisions" regarding repairs and maintenance for the Property. (Pl. Ex. F.)
(continued...)

In summary, while there are disputed issues surrounding the adequacy of consideration for the initial transfer of the Property by Taxpayers to Stewart Asset Company, the government has provided substantial evidence to support the other *Porta-John* factors, including transfer of the Property in anticipation of tax liability, evidence of a close relationship between Taxpayers and the Trust, and Taxpayers' continuing control over and enjoyment of the benefits of the Property while owned by the Trust. The Court's inquiry into nominee status "requires consideration of all the facts and circumstances to determine the true beneficial owner of the property . . . ." *Spotts*, 429 F.3d at 253 n.2 (noting that "rigid adherence" to the *Porta-John* factors "may not be appropriate for every case"). Considering all the evidence before the Court in the light most favorable to Defendants, the Court is satisfied that the government has fulfilled its burden to show that the Trust is the nominee of Taxpayers with respect to the Property and the lien at issue. Except on the issue of consideration, none of the government's evidence is challenged or disputed by Defendants; thus, there is no genuine issue of material fact with respect to the Trust's nominee status. Having resolved the issue of nominee status, the Court declines to determine whether the Trust is also the alter ego of Taxpayers.

Finally, other than the Trust, the Court notes that none of the other Defendants have asserted an interest in the Property.

---

[13](...continued)
Dr. DeTar's general, unsworn statements made in response to the government's requests for admission do not conflict with the specific evidence provided by the government, and are insufficient to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e).

## III. Conclusion

For the foregoing reasons, the Court finds that there is no genuine issue of material fact that: (1) Taxpayers have outstanding tax liabilities for taxes assessed in 1999; (2) the foregoing tax assessment constitutes a continuing lien against property of Taxpayers under 26 U.S.C. §§ 6321, 6322; (3) the Trust is the record owner of the Property; (4) the Property is "property" or "rights to property" of Taxpayers under 26 U.S.C. § 6321 because the Trust is the nominee of Taxpayers with respect to the Property; and (5) none of the Defendants have interests in the Property that are superior to the rights of the government under the foregoing lien.

Thus, the Court will deny Trustee's motion for summary judgment, and grant the government's motion for summary judgment in part, solely with respect to foreclosure of the foregoing tax lien. The Court will also deny Dr. DeTar's motion for an order to expunge the government's cross-motion for summary judgment because Dr. DeTar provides no authority for the Court to enter such an order.

An order will be entered that is consistent with this opinion.


Dated: <u>July 28, 2009</u>　　　　　　　　　　　　　　　　/s/ Robert Holmes Bell　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　　ROBERT HOLMES BELL
　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE